**Tamara PRYOR, on behalf of herself all others similarly situated, Plaintiffs,**

v.

**AEROTEK SCIENTIFIC, LLC, Defendant.**

**No. CV 10–06575 MMM (AJWx).**

United States District Court, C.D. California.

Nov. 15, 2011.

---

**26.** (Hanson Decl., Ex. S at 3.)

Charles Z. Stein, Craig J. Ackermann, Ackermann & Tilajef PC, Los Angeles, CA, Jesse Bernard Levin, Jordan S. Esensten, Melissa M. Harnett, Wasserman Comden Casselman & Esensten L.L.P., Tarzana, CA, for Plaintiffs.

Aaron F. Olsen, Michael S. Kun, Epstein Becker & Green PC, Los Angeles, CA, for Defendant.

## ORDER DENYING CLASS CERTIFICATION

MARGARET M. MORROW, District Judge.

On August 2, 2010, Tamara Pryor commenced this action in Los Angeles Superior Court.[1] On September 2, 2010, Aerotek, Inc. removed the action to this court under the Class Action Fairness Act of 2005.[2] Pryor filed a first amended complaint on October 1, 2010, terminating Aerotek, Inc. as a defendant and adding Aerotek Scientific, LLC ("Aerotek").[3] After the court dismissed Pryor's first amended complaint,[4] Pryor filed a second amended complaint on March 23, 2011.[5]

On September 23, 2011, Pryor filed a motion for class certification.[6] She seeks to certify a class under Rule 23 of the Federal Rules of Civil Procedure consisting of "[a]ll employees of Aerotek Scientific, LLC ('Aerotek') who were assigned to a UnitedHealth Group (UHG) Prescription Solutions call center in California at any time from August 2, 2006 through the present."[7] Defendant opposes plaintiff's motion.[8]

## I. FACTUAL BACKGROUND

Aerotek, a Maryland staffing corporation, operates call centers in California, including two United Health Group Prescription Solutions call centers in Cypress and Costa Mesa,

---

1. Notice of Removal ("Removal"), Docket No. 1 (Sept. 2, 2010), Exh. 1 (Class Action Complaint ("Complaint")) at 1.

2. Removal at 1.

3. First Amended Complaint ("First Amended Complaint"), Docket No. 7 (Oct. 1, 2010) at 1.

4. Order Granting Defendant's Motion to Dismiss ("Dismissal"), Docket No. 21 (Mar. 14, 2011).

5. Plaintiff's Second Amended Class Action Complaint ("Second Amended Complaint"), Docket No. 22 (Mar. 23, 2011).

6. Motion for Class Certification ("Motion"), Docket No. 57 (Sept. 23, 2011).

7. Motion at 1.

8. Defendant Aerotek Scientific, LLC's Opposition to Plaintiff's Motion for Class Certification ("Opposition"), Docket No. 63 (Sept. 30, 2011).

California.[9] Pryor alleges that she was employed by Aerotek at the Costa Mesa call center from November 2009 to February 2010.[10]

Pryor alleges that during the class period, Aerotek imposed a number of requirements that compelled her and other class members to perform pre-shift work without compensation.[11] She asserts that employees were required to arrive at work at least 10 minutes before the beginning of their shifts so that they could log into their computers and be ready to immediately begin receiving calls once their shift started.[12] Pryor alleges that she routinely reported to work at least ten minutes before her shift to comply with this requirement.[13] Employees were allegedly instructed to report only the time they were logged into Aerotek's telephone system (VCC) on their timecards; this did not include time spent logging onto the computer system before they logged into VCC.[14] Aerotek allegedly directed Pryor and other class members to round their start and end times to the nearest 15-minute interval, and prohibited them from logging into the VCC before their scheduled start time, which "ensur[ed] that the vast majority of any rounding, if not all rounding, would be in Defendant's favor."[15] As a result of these practices, Pryor and other members of the class allegedly were not compensated for time they worked prior to logging into the VCC.[16]

Pryor asserts that Aerotek's policies resulted in under-compensation and denial of overtime wages to which employees were entitled.[17] She contends that Aerotek knowingly issued inaccurate paystubs to her and other class members that failed to account for and compensate employees' pre-shift working time.[18] Additionally, when employees left the company, they were purportedly not compensated for their pre-shift working hours.[19]

Pryor pleads claims for failure to pay wages due for pre-shift work and failure to pay overtime, failure to provide accurate itemized wage statements; failure to pay wages upon termination; and unfair, unlawful, and fraudulent business practices in violation of California's Unfair Competition Law, Business & Professions Code § 17200 et seq.[20]

## II. DISCUSSION

### A. Aerotek's Motion to Strike

As a preliminary matter, Aerotek moves to strike Pryor's motion for class certification as untimely.[21] The court has directed that "[a]ll documents which are required to be filed in an electronic format pursuant to General Order No. 10–07 shall be filed electronically not later than 5 p.m. on the date due unless otherwise ordered by the court. Any document filed electronically after 5:00 p.m. on the date due will be considered late and may be stricken by the court." Pryor does not deny that the she filed her motion after 5:00 p.m. She asks, however, that the court either accept the motion and treat it as timely-filed or, alternatively, extend the deadline retroactively so that a motion filed prior to midnight will be deemed timely.[22]

---

9. Second Amended Complaint, ¶ 3.; Motion at 3.

10. Second Amended Complaint, ¶ 3.

11. *Id.*, ¶ 19.

12. *Id.*, ¶¶ 4, 19.; Second Amended Complaint, Exh. A (Prescription Solutions—Job Preview) (employees are required to pledge: "I understand that I must be at work at least 10 minutes before my shift starts so that I am logged into my computer and ready to work at my scheduled start time. I understand that if I am one minute late that is still considered late in the system").

13. Second Amended Complaint, ¶ 19.

14. *Id.*,

15. *Id.* Pryor has since argued that employees were allowed to log into VCC five minutes before the start of their scheduled shift. (Motion at 2).

16. *Id.*, ¶ 20.

17. *Id.*, ¶ 24.

18. *Id.*, ¶¶ 25–26.

19. *Id.*, ¶ 28.

20. *Id.* at 1.

21. Opposition, Exh. 12 (Defendant Aerotek Scientific, LLC's Objection and Request to Strike Plaintiff's Untimely Motion for Class Certification and Supporting Papers ("Motion to Strike")).

22. Plaintiff's *Ex Parte* Motion to Treat Plaintiff's Motion for Class Certification as Timely Filed and/or Extend Retroactively the Court's 5 pm E-Filing Deadline for Plaintiff's Motion for Class

Rule 6(b)(1) of the Federal Rules of Civil Procedure provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Central District of California General Order 10–07 provides that, unless otherwise ordered by the assigned judge, all electronic transmissions of documents are to be received by the Clerk's Office by midnight on the date due. This court has set an earlier time by which filings are due, i.e., 5:00 p.m. Pryor's counsel contends he failed to realize that the court had modified the filing time set forth in the General Order.[23]

■ "Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect, it is clear that 'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Pioneer Investment Services Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380, 392, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). The Ninth Circuit has held that, for purposes of Rule 6(b), "excusable neglect" must be judged by the standard set forth in *Pioneer.* See *Speiser, Krause & Madole P.C. v. Ortiz,* 271 F.3d 884, 888 (9th Cir.2001) (applying the *Pioneer* "excusable neglect" standard in a Rule 6(b)(2) analysis); *Briones v. Riviera Hotel & Casino,* 116 F.3d 379, 381 (9th Cir.1997) ("In *Committee for Idaho's High Desert, Inc.,* this court held that the Supreme Court's analysis of 'excusable' neglect in *Pioneer* is applicable to Rule 6(b) . . . ," citing *Committee for Idaho's High Desert, Inc. v. Yost,* 92 F.3d 814, 825 n. 4 (9th Cir.1996) ("While *Pioneer* involved Bankruptcy Rule 9006(b), the Court's analysis was based on the plain meaning of the phrase 'excusable neglect' and drew on its use in other procedural contexts, including Fed.R.Civ.P. 6(b) and Fed.R.Crim.P. 45(b). This court has held that the Court's analysis of 'excusable neglect' in *Pioneer* applies to the use of that phrase in Fed.R.App.P. 4(a) (5).

The same decision suggests that the analysis applies to Fed.R.Civ.P. 6(b) as well")).

■ A "determination of whether neglect is excusable is an equitable one that depends on at least four factors: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Bateman v. United States Postal Serv.,* 231 F.3d 1220, 1223–24 (9th Cir. 2000) (citing *Pioneer,* 507 U.S. at 395, 113 S.Ct. 1489); see also *Franchise Holding II, LLC v. Huntington Restaurants Group, Inc.,* 375 F.3d 922, 927 (9th Cir.2004) ("Excusable neglect is an equitable concept that takes account of factors such as 'prejudice, the length of the delay and impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith,'" quoting *TCI Group Life Ins. Plan v. Knoebber,* 244 F.3d 691, 696 (9th Cir.2001)); *Briones,* 116 F.3d at 381 (noting that these four factors are not exclusive, but "provide a framework with which to determine whether missing a filing deadline constitutes 'excusable' neglect").

■ Applying the *Pioneer* factors here, the court concludes Pryor has demonstrated that her failure to file the certification motion by the 5:00 p.m. deadline was the result of excusable neglect. First, defendant's claim of prejudice dubious at best. Aerotek suggests it was damaged by the late filing because it only had "one week to oppose the motion."[24] Having received plaintiff's motion a few hours earlier on the day of filing would not have changed that fact. Aerotek, moreover, has been aware of the class Pryor would attempt to certify since September 2, 2010. There is nothing in Pryor's motion for class certification that should have surprised Aerotek, and indeed, nothing in it that Aerotek has not spent over a year preparing to oppose. Accordingly, the *Pioneer* first factor favors granting plaintiff's request for an enlargement of time.

Certification (*"Ex Parte* Motion to Treat Motion as Timely Filed"), Docket No. 64 (Oct. 7, 2011).

**23.** *Id.* at 6–7.

**24.** Motion to Strike at 1.

As respects the second factor—the length of the delay and its potential impact on the proceedings—Pryor filed her application on the day it was due, albeit a few hours later than the deadline set by the court. The delay did not impact the proceedings in any significant respect. Thus, the second factor also favors granting plaintiff's request for an enlargement of time.

The third factor examines plaintiff's reason for the delay. Pryor asserts that her attorneys believed the deadline set forth in the General Order controlled rather than the specific deadline set for filings in this court. This is a sufficient explanation for their failure to file the motion in a timely fashion. As *"Pioneer Investment* made clear[,] ... the word 'neglect' 'encompasses simple, faultless omissions to act and, more commonly, omissions caused by carelessness.'" *TCI Group Life Ins. Plan,* 244 F.3d at 697 (quoting *Pioneer Investment Services,* 507 U.S. at 388, 113 S.Ct. 1489). The Ninth Circuit has held that "intentional" or culpable omissions to act are only those that are "willful, deliberate, or evidence of bad faith," while "[n]eglectful failure to answer as to which the defendant offers a credible, good faith explanation negating any intention to take advantage of the opposing party, interfere with judicial decisionmaking, or otherwise manipulate the legal process is not 'intentional' ..., and is therefore not necessarily ... culpable or inexcusable." *Id.* at 697–98. Thus, this factor too favors granting Pryor's request for an enlargement of time.

The final factor is whether Pryor acted in good faith. There is no evidence that her failure to file by 5:00 p.m. was a product of bad faith or that she purposefully missed the filing deadline. Stated differently, her failure to file earlier on the day her motion was due was not a "devious, deliberate, willful, or bad faith failure...." *TCI Group Life Ins. Plan,* 244 F.3d at 698. Thus, this factor favors granting Pryor's request for an enlargement of time as well.

Having considered each of the *Pioneer* factors, the court concludes that Pryor's delay was excusable. Striking the certification motion would be contrary to the goal of deciding cases on their merits. The court therefore extends the time for the filing of plaintiff's class certification motion to midnight on September 23, 2011.

## B. Legal Standard Governing Class Certification

A district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. PROC. 23(a).

In addition, a district court must also find either that at least one of the several conditions set forth in Rule 23(b) is met. As the Supreme Court explained:

"Rule 23(b)(1) allows a class to be maintained where 'prosecuting separate actions by or against individual class members would create a risk of' either '(A) inconsistent or varying adjudications,' or '(B) adjudications ... that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede[ ] their ability to protect their interests.' Rule 23(b)(3) states that a class may be maintained where 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.' "

*Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2549 n. 2, 180 L.Ed.2d 374 (2011).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 2551. Thus, "[t]he party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met."

*Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1186 (9th Cir.), amended by 273 F.3d 1266 (9th Cir.2001); see also *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992). The class can be certified only if the court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160–61, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).[25]

## C. Whether Plaintiffs Have Identified an Ascertainable Class

Although not specifically mentioned in Rule 23(a), there is an additional prerequisite to certification—that the class be ascertainable. See, e.g., *Lukovsky v. San Francisco,* No. C 05–00389 WHA, 2006 WL 140574, *2 (N.D.Cal. Jan. 17, 2006) (" 'Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed,' " quoting *Schwartz v. Upper Deck Co.,* 183 F.R.D. 672, 679–80 (S.D.Cal.1999)); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,* 209 F.R.D. 159, 163 (C.D.Cal.2002) ("Prior to class certification, plaintiffs must first define an ascertainable and identifiable class. Once an ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)" (citation and footnote omitted)); *O'Connor v. Boeing North American, Inc.,* 184 F.R.D. 311, 319 (C.D.Cal.1998) (holding that a class definition must be "precise, objective and presently ascertainable"); *Bishop v. Saab Auto. A.B.,*

No. CV 95–0721 JGD (JRx), 1996 WL 33150020, *4 (C.D.Cal. Feb. 16, 1996) ("To file an action on behalf of a class, the named plaintiffs must be members of the class that they purport to represent at the time the class action is certified. The named plaintiffs must also demonstrate that the class is ascertainable" (citation omitted)).[26]

A class is sufficiently defined and ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member." *O'Connor,* 184 F.R.D. at 319; accord *Davoll v. Webb,* 160 F.R.D. 142, 143 (D.Colo.1995); see also *Buford,* 168 F.R.D. at 347 ("[T]he 'description of the class must be sufficiently definite to enable the court to determine if a particular individual is a member of the proposed class,' " quoting *Pottinger v. Miami,* 720 F.Supp. 955, 957 (S.D.Fla.1989)).

Pryor seeks to certify a class consisting of "[a]ll employees of Aerotek Scientific, LLC ('Aerotek') who were assigned to a UnitedHealth Group (UHG) Prescription Solutions call center in California at any time from August 2, 2006 through the present."[27] Defendant has not challenged the ascertainability of the class, nor could it. Membership in the class is not ambiguous or speculative, but depends solely on being employed by Aerotek and assigned to a UnitedHealth Group Prescription Solutions call center in California during the class period. Thus, "all the parameters for membership in this class are objective criteria, and defendants' business records should be sufficient to determine the class membership status of any given individual." *Hofstetter v. Chase Home*

---

**25.** The Supreme Court has noted that "[f]requently ... 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Dukes,* 131 S.Ct. at 2551.

**26.** See also, e.g., *In re A.H. Robins Co., Inc.,* 880 F.2d 709, 728 (4th Cir.1989) (same), abrogated on other grounds by *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Bentley v. Honeywell Int'l, Inc.,* 223 F.R.D. 471, 477 (S.D.Ohio 2004) ("Before delving into the 'rigorous analysis' required by Rule 23, a court first should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class"); *Robinson v. Gillespie,* 219 F.R.D. 179,

183 (D.Kan.2003) ("In determining whether to certify a class, the court begins with the proposed definition of the class" because "[a]bsent a cognizable class, determining whether Plaintiffs ... satisfy the other Rule 23(a) and (b) requirements is unnecessary" (internal quotations omitted)); *Buford v. H & R Block, Inc.,* 168 F.R.D. 340, 346 (S.D.Ga.1996) ("Before considering the requirements of Rule 23 ... a court must determine whether a class exists that can adequately be defined.... [C]lass definition is an implicit requirement which must be met before a Rule 23 analysis can be undertaken by the district court").

**27.** Motion at 1; Second Amended Complaint, ¶ 7.

*Finance, LLC,* No. C 10–01313, 2011 WL 1225900, *14 (N.D.Cal. Mar. 31, 2011) (finding that the ascertainability requirement was satisfied); see also *Gardner v. Shell Oil Co.,* No. C 09–05876, 2011 WL 1522377, *4 (N.D.Cal. Apr. 21, 2011) ("Defendants do not dispute that members of the proposed class can be identified from their timekeeping and payroll records. Accordingly, the Court finds that the class definitions are sufficiently particular and ascertainable"); *Misra v. Decision One Mortg. Co.,* No. SA CV 07–0994 DOC (RCx), 2009 WL 4581276, *4 (C.D.Cal. Apr. 13, 2009) ("[T]his Class is ascertainable because the Class members were employed by Decision One and can be determined from employment records"). Aerotek witnesses, in fact, have testified at deposition about the number of people who are members of the class.[28] The court therefore concludes that the class is ascertainable.

### D. Numerosity

Under the Federal Rules of Civil Procedure, before a class can be certified, the court must determine that the class is "so numerous that joinder of all members is impracticable." See FED.R.CIV.PROC. 23(a)(1). "Impracticability does not mean impossibility, [however,] ... only ... difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913–14 (9th Cir. 1964) (internal quotations omitted). There is no set numerical cutoff used to determine whether a class is sufficiently numerous; courts must examine the specific facts of each case to evaluate whether the requirement has been satisfied. See *General Tel. Co. v. EEOC,* 446 U.S. 318, 329–30, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). "As a general rule, [however,] classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *Ikonen v. Hartz Moun-*

*tain Corp.,* 122 F.R.D. 258, 262 (S.D.Cal. 1988) (citing 3B J. Moore & J. Kennedy, MOORE'S FEDERAL PRACTICE ¶ 23–05[1] (2d ed. 1987)). Pryor asserts that there are 442 members of the putative class, and has adduced evidence supporting this assertion.[29] Aerotek has not challenged Pryor's satisfaction of the numerosity requirement, and the court therefore concludes that it has been met.

### E. Commonality

Commonality requires "questions of law or fact common to the class." See FED.R.CIV. PROC. 23(a)(2). The commonality requirement is construed liberally, and the existence of some common legal and factual issues is sufficient. *Jordan v. County of Los Angeles,* 669 F.2d 1311, 1320 (9th Cir.1982); accord *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998) ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively"); see also, e.g., *Ventura v. New York City Health & Hosps. Corp.,* 125 F.R.D. 595, 600 (S.D.N.Y.1989) ("Unlike the 'predominance' requirement of Rule 23(b)(3), Rule 23(a)(2) requires only that the class movant show that a common question of law or fact exists; the movant need not show, at this stage, that the common question overwhelms the individual questions of law or fact which may be present within the class"). As the Ninth Circuit has noted: "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon,* 150 F.3d at 1019.

That said, the putative class's "claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That com-

---

**28.** Declaration of Devin Coyle in Support of Motion for Class Certification ("Coyle Decl."), Docket No. 60 (Sept 23, 2011), Exh. C, Deposition of Michael John Micallef III ("Micallef Depo.") at 12:20–13:8 ("Q. And turning your attention to topic 16 which is right—listed right below there, it says the number of individuals employed by Aerotek Scientific, LLC, who were assigned to a UnitedHealth Group Prescription Solutions call

center in California at any time from August 2nd, 2006, to the present. Do you have knowledge about how many individuals have been assigned by Aerotek to the Prescription Solutions call centers in California. A. Yes. Q. And how many, approximately, have there been? A. I think it was 400. A little over 400").

**29.** Motion at 15; Micallef Depo. at 12:20–13:8

mon contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S.Ct. at 2551. Although for purposes of Rule 23(a)(2) even a single common question will do, *id.* at 2556., " '[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.' " *Id.* at 2551 (citing Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.REV. 97, 132 (2009)).

Plaintiffs contend that one common question at issue in this litigation is "[w]hether Aerotek had actual knowledge that associates were performing pre-shift work by virtue of the memos issued to associates and/or constructive knowledge that associates were performing pre-shift 'off-the-clock' work as a function of its joint-employer relationship with UnitedHealth Group." [30] This is undoubtedly a common question that is capable of classwide resolution. *Gales v. Winco Foods,* No. C 09–05813 CRB, 2011 WL 3794887, *2 (N.D.Cal. Aug. 26, 2011) (finding commonality because there was a question common to all class members—whether WinCo's policy classifying member of the class exempt was correct and "was done knowingly"). No individualized inquiry is required to determine whether Aerotek knew employees were working off-the-clock during pre-shift periods.

Pryor also contends that there is a common question as to whether Aerotek's policies regarding when employees were to arrive at work, when they could log into the VCC system, and how they were to record their time resulted in underpayment of wages and nonpayment of overtime. [31] The Supreme Court's decision in *Dukes* rested on the fact that a nationwide class of Wal–Mart

employees could not show commonality in a discrimination suit because promotion and pay decisions were committed to the discretion of local managers. *Dukes,* 131 S.Ct. at 2546, 2548. Here, Pryor has proffered evidence that the policies about which she complains were commonly applied to all class members. As an Aerotek witness testified, the policy that employees were to arrive at work ten minutes before their shift time applied to all associates assigned to Prescription Solutions. [32] The witness also testified that it was Aerotek's policy that the time employees spent logging onto their computer and booting up various programs was not compensable time. [33] She stated that employees were directed to record the time reflected in the VCC system as their daily hours, and to round hours worked to the nearest 15–minute interval. [34] Finally, the witness testified that Aerotek instructed employees not to log into the VCC system until five to ten minutes before their shift. [35]

Applying *Dukes,* several courts have found that the fact an employee challenges a policy common to the class as a whole creates a common question whose answer is apt to drive the resolution of the litigation. *Gales,* 2011 WL 3794887, *2 ("Here, in contrast [to *Dukes* ], Plaintiff identifies and objects to a single policy that affects all would-be class members: WinCo's policy of classifying all AMs as exempt. This theory of the case presents several common questions, such as whether WinCo's classification was correct, whether it was done knowingly, whether all class members share similar job duties, and the proper categorization of those duties as exempt or not-exempt"); see also *Nehmelman v. Penn Nat. Gaming, Inc.,* No. 11 C 23, 2011 WL 4538698, *9 (N.D.Ill. Sept. 29, 2011) (rejecting, in a FLSA action where plaintiffs alleged, *inter alia,* that the employer made employees clock in seven minutes before their shift and clock out no more than seven minutes after their shift ends and rounded the hours worked to reflect actual shift times, defendant's argument that

---

**30.** Motion at 20.

**31.** *Id.* at 14–15.

**32.** Micallef Depo. At 69:23–70:24.

**33.** *Id.* at 127:7–20, 129:1–15.

**34.** *Id.* at 121:12–122:15.

**35.** *Id.* at 103:5–16.

*Dukes'* analysis of commonality should guide the analysis because, unlike *Dukes,* "[t]here [was] no similar policy of discretion with respect to rounding hours in this case"). This accords with the pre-*Dukes* caselaw in this circuit. *Dilts v. Penske Logistics, LLC,* 267 F.R.D. 625, 627 (S.D.Cal.2010) (finding commonality when "[p]laintiffs ... provided evidence that indicates that they were subject to all of these alleged wrongs and that the relevant policies were common across Defendant's California facilities"); *Wren v. RGIS Inventory Specialists,* 256 F.R.D. 180, 205 (N.D.Cal.2009) (concluding that commonality was satisfied because plaintiff had proffered evidence of a company-wide policy regarding donning and waiting time).

The court is not wholly convinced that the alleged common policies identified by Pryor justify certification of a class. As the Court stated in *Dukes,* the critical inquiry is not whether there are common questions, but whether they will generate common answers. *Dukes,* 131 S.Ct. at 2551. The Court observed that "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Id.* In its opposition, Aerotek argues that there are a number of differences between members of the proposed class that defeat commonality, including evidence that employees frequently arrived late instead of early and evidence that there was significant variation in how early employees were told to arrive for work. Aerotek argues that Pryor cannot offer common proof regarding the total time employees worked each day, as required to establish an entitlement to overtime compensation.[36] As discussed *infra,* these variations indicate that whether a particular employee was actually under-compensated or denied overtime wages cannot be resolved on a classwide basis.

Nonetheless, *Dukes* made clear that a single common question suffices to establish commonality. Aerotek's witness testified that there were class-wide policies and directives in effect. What these were is a common questions that can generate a single answer applicable to the entire class. The court thus concludes that the commonality requirement is met, and will address Aero-

tek's arguments regarding dissimilarities among class members in considering the more rigorous predominance requirement. *Gales,* 2011 WL 3794887 at *2, *6 (concluding that whether the employer's had correctly classified the job duties of a group of employees as exempt was a common question, but that predominance was not satisfied because determining whether each class member spent the majority of his or her time performing exempt duties required an individualized inquiry).

### F. Typicality

Typicality requires a determination as to whether the named plaintiff's claims are typical of those of the class members she seeks to represent. See FED.R.CIV.PROC. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon,* 150 F.3d at 1020; see also *Schwartz v. Harp,* 108 F.R.D. 279, 282 (C.D.Cal.1985) ("A plaintiff's claim meets this requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory").

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon,* 976 F.2d at 508 (citation and internal quotations omitted). Typicality, like commonality, is a "permissive standard[ ]." *Hanlon,* 150 F.3d at 1020. Indeed, in practice, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon,* 457 U.S. at 157–58 n. 13, 102 S.Ct. 2364. See also *Dukes,* 131 S.Ct. at 2551 n. 5 ("We have previously stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the

**36.** *Id.* at 2.

class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest,' " citing *Falcon*, 457 U.S. at 158 n. 13, 102 S.Ct. 2364).

■ Typicality may be found lacking "if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.' " *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990)); see also *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir.1980) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation").

■ As with its commonality argument, Aerotek argues only in passing that the typicality requirement is not satisfied.[37] It does not directly state in what way it believes Pryor's claims are not typical of the class claims. The court can identify one argument that possibly affects typicality in the brief Aerotek has filed. Aerotek argues that Pryor frequently over-reported the time she worked, including on her first day of employment and on several occasions during her first month of training.[38] At least one court in this district has previously denied class certification in part because of concerns that the class representative was not typical given allegations that she was overpaid rather than underpaid. *Coughlin v. Sears Holdings Corp.*, No. SACV 08–00015 CJC (RNBx), 2010 WL 4403089, *5 (C.D.Cal. Oct. 26, 2010) ("First, her own claims are atypical from the claims of the broad class that she proposes

because her claims are subject to a unique defense. Although the Court does not speculate as to the merits of Defendants' challenge that Ms. Coughlin suffered no injury and thus lacks standing, the briefing on that issue is relevant to typicality. According to Ms. Coughlin, she was 'underpaid by 0.6738 days.' In response, Defendants assert that Ms. Coughlin was overpaid. If Defendants are correct, then Ms. Coughlin suffered no injury even under her interpretation of Defendants' vacation and personal time policies, and her claims would not be typical of proposed class members that were not fully compensated for vested and unused vacation and personal time").

Aerotek challenges Pryor's contention that she was underpaid for her first day of work, noting that she testified she was told to arrive at work that day at 1:40 p.m.[39] Using this start time, and Pryor's testimony that her daily training typically lasted from 2:00 p.m. to 10:00 p.m., with a half hour break for lunch,[40] Aerotek concludes that Pryor worked only 7 hours, 50 minutes that day.[41] Since Pryor evidently recorded 8 hours of work for the day, Aerotek asserts that she in fact over-reported her time, not under-reported it.[42] Aerotek's logic requires the court to assume that Pryor's first day of training ended at the time she stated training generally ended, i.e., 10:00 p.m. Elsewhere in her deposition, however, Pryor testified that training sometimes went past 10:00 p.m.; she "guessed" that the sessions never went later than 10:15 p.m.[43] This leaves open the possibility that Pryor's testimony is consistent with her claim that she was not properly compensated for her first day of work. In fact, Pryor has submitted a declaration stating that her deposition testimony was incorrect, and that her training each day ran from 2:00 p.m. to 10:30 p.m., with a half hour lunch break.[44] A factfinder could believe this re-

---

37. *Id.* at 9 ("Plaintiff has failed to establish commonality and typicality; in the interests of brevity, this analysis will be addressed as part of the analysis of Rule 23(b) below").

38. *Id.* at 6–7.

39. Opposition, Exh. 7 ("Defendant's Pryor Deposition Excerpts") at 51:23–52:12.

40. *Id.* at 47:18–48:9.

41. Opposition at 6.

42. *Id.*

43. Defendant's Pryor Deposition Excerpts. at 65:5–17.

44. Declaration of Tamara Pryor in Support of Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Class Certification, Docket No. 70 (October 7, 2011) at 1.

vised account of the hours she generally worked and conclude that Pryor's eight recorded hours of work for that day were in fact fewer hours than she had actually worked.

Aerotek also cites Pryor's testimony that training began at 2:00 p.m. and generally ended by 10:00 p.m. as evidence that she over-reported her time more generally during the month she was training.[45] It asserts that, since Pryor was compensated for having worked eight hours on 16 different days during the month, she was actually over-compensated for the period. The court acknowledges that the deposition testimony Aerotek cites casts doubt on Pryor's ability to show she was under-compensated during her training period. As noted, however, Pryor has revised her account of hours worked, stating that her training each day ran from 2:00 p.m. to 10:30 p.m., with a half hour lunch break.[46] Defendant's assertion that Pryor was over-compensated also rests on a contention that "[e]ven if there were a few minutes of 'pre-shift' work time, [Pryor's] total work time would still be well under eight hours."[47] Aerotek does not direct the court to any testimony that would allow it to assume that only "a few" minutes of pre-shift work was performed by Pryor on these days, however. In fact, there is testimony in the record indicating that employees such as Pryor were directed to arrive as much as ten minutes before their schedule start time. Added to Pryor's revised view of the hours she worked during the training period, this would result in more than eight hours worked during a day. Even assuming a factfinder ultimately believes Pryor's earlier testimony about the hour at which her training ending, and discounts her attempt to modify it, moreover, the most the testimony proves is that there were a number of days on which Pryor was compensated for a full eight hours of work when pre-shift work is included. Depending on the variables ultimately found by the trier of fact, therefore, it is not clear that Pryor is subject to a unique defense that renders her claims atypical.

Additionally, as the Ninth Circuit has made clear, the key question is whether a class representative is subject to a *unique* defense, such that she will be "preoccupied" and whether the defense will become the focus of the litigation to the detriment of the class. *Hanon,* 976 F.2d at 508. To be typical, a class member need not prove that she is immune from any possible defense, or that her claim will fail only if every other class member's claim also fails. Instead, she must establish that she is not subject to a defense that is not "typical of the defenses which may be raised against other members of the proposed class." *Id.;* see also *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 984–85 (9th Cir.2011). Since the critical question in this case is whether Aerotek's policies compelled class members to work hours for which they were not compensated, the argument that Pryor was compensated for all hours she worked is not a unique defense.

Aerotek does not dispute that Pryor was a call center employee at a Prescription Solutions call center, and that she seeks to represent a group of similarly situated employees. See *Campbell v. PricewaterhouseCoopers, LLP,* 253 F.R.D. 586, 596 (E.D.Cal.2008) (holding that the typicality requirement was met, but only as to positions plaintiffs actually held in one division of the Assurance line of service); compare *Ho v. Ernst & Young, LLP,* Nos. 5:05–cv–04867–JF, 5:08–cv–04988–JF, 5:08–cv–02853–JF, 2011 WL 4403625, *2–3 (N.D.Cal. Sept. 20, 2011) ("Fernandez worked in the Assurance group; she worked only as staff—she never held a senior position. Richards worked in the Tax group as a staff and a senior. E & Y argues persuasively that Fernandez and Richards are not typical of persons who worked in entirely different positions. Several district courts addressing wage and hour class claims in the context of large accounting firms have held that named plaintiffs cannot represent employees who worked in different lines and different positions"). Pryor alleges that her rights were violated by policies that were applicable to the class as a whole. *Gales,*

---

45. Opposition at 6–7.

46. Declaration of Tamara Pryor in Support of Plaintiff's Reply to Defendant's Opposition to

Plaintiff's Motion for Class Certification, Docket No. 70 (October 7, 2011) at 1.

47. Opposition at 7.

2011 WL 3794887 at *3 (finding the typicality requirement met because "[p]laintiff's claims arise from the same remedial or legal theories as those of the proposed class: all are subject to the same classification policy"). The court therefore concludes that Pryor has satisfied the typicality requirement.

**G. Adequacy**

██ The adequacy of representation requirement set forth in Rule 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020; accord *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir.2003). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis*, 657 F.3d at 985.

██ Aerotek argues that Pryor is not an adequate class representative because she was "only employed by Aerotek for 10 weeks, 4 of which were spent in training." [48] It does not describe why her short tenure will put her at odds with other members of the class, however. Adequacy is not defeated merely because there are factual differences between the class representative and other members of the proposed class, unless those differences indicate that the class representative's attempt to obtain relief may come at the expense of the interests of the class as a whole. *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir.1998) (addressing the government's contention that certain of the class representatives had admitted document fraud and thus could not show prejudice as a result of the INS's allegedly unconstitutional policies, the court stated: "We find no merit in the government's position. Once again, the government erroneously emphasizes factual differences in the merits of the underlying document fraud charges. Such differences have no bearing on the class representatives' abilities to pursue the class claims vigorously and represent the interests of the absentee class members").

Aerotek also suggests that Pryor has done no more than lend her name to this case. [49] It notes that Pryor testified at her August 10, 2011 deposition that she had not met her attorneys until the day before her deposition, despite the fact that suit was filed more than a year earlier. [50] The court notes additional troubling indications that Pryor's counsel is the real party directing this litigation. During her deposition, Pryor was asked how she would have recorded her hours if she worked from 1:55 to 6:05. [51] She testified that, in accordance with Aerotek policies, she would have recorded 4.25 hours, meaning that she combined the five minutes before 2:00 and the five minutes after 6:00, then rounded the resulting 10 minutes to the nearest 15–minute interval. [52] Pryor's lawyer promptly suggested a break be taken, and upon returning, suggested that Pryor may have been "a little confused." [53] He asked Pryor the same question again, and she replied: "We used the time of 1:55 as the start time, so I should round 1:55 to the nearest 15–minute interval, which is 2:00. And the end time we used was 6:05, and the nearest 15–minute interval to 6:05 would be 6:00. It's closer to 6:00 than 6:15." [54] The declaration filed by Pryor following her deposition, in which she asserts she "mistakenly" told defense counsel that she worked from 2:00 p.m. until 10:00 p.m., instead of until 10:30 p.m. also gives the court pause. [55]

██ Individuals are not adequate representatives of a class when "it appears that they have abdicated any role in the case beyond that of furnishing their names as plaintiffs." *Helfand v. Cenco, Inc.*, 80 F.R.D. 1, 7 (N.D.Ill.1977). "Several district courts thus have properly denied class certification

---

48. Opposition at 9.

49. *Id.*

50. Defendant's Pryor Deposition Excerpts at 41:6–22.

51. *Id.* at 291: 3–10.

52. *Id.* at 291:17–293:16.

53. *Id.* at 295:1–296:1.

54. *Id.* at 296:24–297:4.

55. Pryor Declaration at 1–2.

where the class representatives had so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir.1987); *Kelley v. Mid–America Racing Stables, Inc.*, 139 F.R.D. 405, 409–10 (W.D.Okla.1990).

■ The court has some reservations, but concludes that Pryor will adequately represent the class. While apparently she did not meet personally with her attorneys until the day before her deposition, it is evident from the complaint, which includes information specifically about Pryor, that she had communications with counsel before it was filed.[56] Pryor willingly participated in a lengthy deposition, during which she demonstrated a familiarity with the issues critical to the case, particularly Aerotek's compensation and timekeeping policies. It thus appears that she has demonstrated a willingness to participate in the litigation, and the court cannot at this stage conclude that she will not adequately fulfill her role as a representative of the proposed class. *Ormond v. Anthem, Inc.*, No. 1:05–cv–1908–DFH–TAB, 2009 WL 3163117, *5 (S.D.Ind. September 29, 2009) ("Anthem argues that the class representatives do not serve as an adequate 'fiduciary check' on the class counsel because the representatives are not actively involved in the litigation. The named plaintiffs' communications with class counsel have been minimal. Ormond has communicated with attorney Dennis Barron on several occasions and has met once with attorney Eric Zagrans.... Cescato has regular communications with Barron and receives court filings from him.... Moore has talked on the phone with Barron a handful of times.... The parties have not directed the court to information establishing that Heekin is in communication with class counsel. Given the relatively undemanding standard for a class representative's involvement in the case, the court is satisfied that the class representatives are in sufficient communication with class counsel"); *In re Insurance Management Solutions Group, Inc. Securities Litigation*, 206 F.R.D. 514, 517 (M.D.Fla.2002) ("[T]his Court finds that Mr. Schmidt possesses the necessary personal characteristics of a class representative by demonstrating a willingness to participate. Mr. Schmidt had several discussions with his attorneys, met with them before his deposition, attended his deposition and answered interrogatories"); *Francisco v. Doctors and Merchants Credit Service, Inc.*, No. 98 C 0716, 1998 WL 474107, *3 (N.D.Ill. Aug. 3, 1998) (concluding that the fact that an individual met with his attorneys in person only once was "insubstantial and [had] little to do with [his] ability to represent the proposed class adequately").

Class counsel also appears to be adequate. Indeed, Aerotek has raised no concerns in this regard. They represent that they have extensive experience,[57] and have thus far litigated the case vigorously. Consequently, the court concludes that Pryor and her attorneys are able adequately to represent the class.

## H. Whether Plaintiff Has Satisfied the Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires two separate inquiries: (1) do issues common to the class "predominate" over issues unique to individual class members, and (2) is the proposed class action "superior" to other methods available for adjudicating the controversy. See FED. R.CIV.PROC. 23(b)(3).

### 1. Predominance

■ The predominance requirement is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prod-*

---

56. Complaint, ¶ 5. The parties have submitted only selected portions of Pryor's deposition testimony, and it is evident that some of her testimony concerning her attorneys is not included. The court does not have page 40 of the deposition, and page 41 begins in the midst of a discussion of Pryor's interactions with her attorneys. (Defendant's Pryor Deposition Excerpts at 41:1–22.) This selective record makes it difficult to determine whether Pryor's comments about only meeting with counsel on the day before her deposition are representative of her contacts with counsel in general.

57. See Declaration of Melissa Meeker Hartnett in Support of Plaintiff's Motion for Class Certification, Docket No. 58 (Sept. 23, 2011); Declaration of Craig Ackermann in Support of Motion for Class Certification, Docket No. 59 (Sept. 23, 2011).

*ucts,* 521 U.S. at 623–24, 117 S.Ct. 2231. If common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then "there is clear justification for handling the dispute on a representative rather than on an individual basis," and the predominance test is satisfied. *Hanlon,* 150 F.3d at 1022. " '[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.' " *Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1190 (9th Cir. 2001) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1778, at 535–39 (1986)). This is because, *inter alia,* "the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." *Id.*

Aerotek devotes most of its opposition to its argument that Pryor cannot meet the predominance requirement. It notes discrepancies in employees' testimony regarding how early they were told to arrive on their first day of work, and how early they were told to arrive in general, and asserts that individualized analysis will be required to determine whether class members worked off the clock.[58] Aerotek also cites evidence that many employees logged into VCC within seconds after logging onto their computers, undermining Pryor's contention that the login process resulted in a significant period of uncompensated time.[59]

The predominance requirement is more likely to be satisfied when the conduct complained of is the result of a common practice by the employer, and when the individualized inquiries that will be required concern class members' damages if the employer is found liable. *Hall v. Best Buy Co., Inc.,* 274 F.R.D. 154, 167 (E.D.Pa.2011) ("The predominant issue in this case is whether Defendants, as a matter of policy, refused to pay employees for off-the-clock time worked, in violation of Pennsylvania's wage and labor laws. That question of liability is thus susceptible to common proof and requires application of just one state's law"); *Farmer v. DirectSat*

*USA, LLC,* No. 08 C 3962, 2010 WL 3927640, *22 (N.D.Ill. Oct. 4, 2010) ("Discovery has shown that there are class-wide questions that predominate over individualized questions. While Plaintiffs have not identified specific written policies with regard to recording time before arriving at or subsequent to leaving a specific job, Plaintiffs have pointed to executive testimony evidencing the existence of such a policy"); *Stiller v. Costco,* No. 09–CV–2473–H (BLM), 2010 WL 5597272, *8 (S.D.Cal. Dec. 13, 2010) (finding that predominance was satisfied where evidence was presented that "Costco had a centralized policy outlined in the 2004 Manual, which caused class members to be detained on a regular basis without pay during lockdowns," and where plaintiffs alleged that it was "Costco's centralized policies that discouraged class members from seeking compensation for the recurring wait time"); *Lopez v. G.A.T. Airline Ground Support, Inc.,* No. 09cv2268–IEG (BGS), 2010 WL 3633177, *8 (S.D.Cal. Sept. 13, 2010) ("[E]ach of the claims asserted by this proposed class are based upon company policies which were consistently applied to all of GAT's employees at the four designated airports."); *Ross v. U.S. Bank Nat. Assoc.,* No. C 07–2951 SI, 2009 WL 4282426, *9 (N.D.Cal. Nov. 25, 2009) (finding that common issues predominated in a case where defendant "admit[ted] it had[ ] a security policy of having at least two employees on duty at all times, which in turn raise[d] a common question as to whether such security policy effectively prohibited employees from taking meal periods and rest breaks on Sundays when only two employees were scheduled to work, and whether defendant [was] liable for such practices"); *Kamar v. Radio Shack Corp.,* 254 F.R.D. 387, 399 (C.D.Cal.2008) ("When the claim is that an employer's policy and practices violated labor law, the key question for class certification is whether there is a consistent employer practice that could be a basis for consistent liability").

In contrast, where individualized proof is required regarding practices or conduct that encouraged employees to work off the clock, courts have concluded that the predominance

---

**58.** Opposition at 12–13, 20

**59.** *Id.* at 17.

requirement is not met. *Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 124 (E.D.N.Y. 2011) ("Plaintiffs have not pointed to an affirmative policy by defendants of not compensating for this work; quite the contrary, Sander acknowledges that maintenance tasks have been compensated through stand-by time. The question is again about practice, and how the policy of not providing an easy way to receive compensation for time spent on maintaining technicians' vans and tools leads to the practice of not compensating for this work"); *Doyel v. McDonald's Corp.*, No. 4:08–CV–1198 CAS, 2010 WL 3199685, *9 (E.D.Mo. Aug. 12, 2010) ("Based on the record, the alleged violations asserted by plaintiffs result not from company-wide policies, but from alleged isolated instances of managers deviating from McDonald's lawful policies which require employees to be paid for all time worked"); *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 641 (N.D.Cal.2010) ("In the absence of any common policy, an individualized inquiry will be required to determine whether any single employee failed to take a meal break because he/she was too busy, and also to determine whether a particular employee signed a waiver based on a decision not to take meal breaks. For this reason alone, common issues do not predominate with regard to the meal break claim"); *Driver v. AppleIllinois, LLC*, 265 F.R.D. 293, 315 (N.D.Ill.2010) ("While there is certainly evidence that not all hours of all employees were recorded (and, therefore, not all hours were compensated), the practices that led to the underreporting differed from restaurant to restaurant so that the common questions do not predominate across the proposed classes of workers in all restaurants").

Here, as noted, while there may be considerable variation in the extent to which individual Aerotek employees were affected by and/or complied with the company's policies, both plaintiff and defendant apparently agree that the policies themselves were standard.

Typically, the fact that a suit challenges policies common to the class weighs strongly in favor of a finding that the predominance requirement is met, since "an internal policy that treats all employees alike ... suggests that the employer believes some degree of homogeneity exists among the employees. This undercuts later arguments that the em-

ployees are too diverse for uniform treatment." *In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 571 F.3d 953, 957 (9th Cir.2009). In *Wells Fargo*, however, the Ninth Circuit concluded that "Wells Fargo's uniform exemption policy says little about the main concern in the predominance inquiry: the balance between individual and common issues." *Id.* at 959. It thus held that the district court had abused its discretion in relying on the policy to the near exclusion of other factors relevant in evaluating predominance. *Id.* This reflects the fact that were a common policy alone sufficient to establish predominance, the predominance requirement would merge with the commonality requirement.

Here, while the policies about which Pryor complains are common, how those policies affect members of the class depends on the individual circumstances of each Aerotek employee. Once the factfinder determines what Aerotek's policies are, that does not answer the ultimate question in the case—whether Aerotek's time reporting policies resulted in the under-compensation of and failure to pay overtime to putative class members. This is not merely a question of damages, it is a question of liability. *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 253 (C.D.Cal. 2006) ("[T]his is not the typical case where a class can be certified because the class members' duties are, or can be determined to be, roughly identical, despite the need for individual damage determinations based on the number of hours worked. Here the variability goes to whether an individual class member has any claim at all"). If Aerotek's records accurately reflect the time worked by a putative class member, and if the company compensated the employee worker accordingly, then (at least as respects that employee), it did not violate the California labor laws on which Pryor's claims rest.

The Ninth Circuit case of *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir.2001), is instructive in assessing when a common policy *does* establish that common issues predominate. There, the Sands casino conceded that it had violated the Worker Adjustment Retraining and Notification ("WARN") Act by giving employees

45 days advance notice of the closure of the casino rather than the statutorily mandated 60 days notice. It argued, however, that the payments it made after the closure satisfied its obligations. *Id.* at 1155. In paying the damages required by the WARN Act, Sands followed certain common procedures about which plaintiffs complained; among these was not including in its calculation the tips employees would have earned during the 15-day period of inadequate notice and deducting severance payments made to nonunion employees. *Id.* at 1156, 1159. Individual plaintiffs, representing a would-be class of nonunion employees, sued. *Id.*

The Ninth Circuit concluded that "[a] common nucleus of facts and potential legal remedies dominate[d] th[e] litigation." *Id.* at 1163 (quoting *Hanlon,* 150 F.3d at 1022). All putative class members, the court reasoned, shared a common interest in three issues: (1) whether "back pay" under the WARN Act includes tips; (2) whether Sands was entitled to deduct severance payments from its WARN Act payments; and (3) whether Sands' mid-July wage payments to nonunion employees were timely under Nevada law. *Id.* The court compared these common issues to the individualized issues, concluding that the individual inquiries were " . . . few, and most of them are likely to be relatively easy."

In *Las Vegas Sands,* however, the court was confident that resolving the three common issues would provide definitive answers that could be applied to all class members' claims. If the "back pay" under the WARN Act included tips, for example, that conclusion would apply to all class members, even though the amount of tips they were entitled to receive might vary depending on the number of days they worked. In this case, by contrast, answering the questions susceptible of classwide proof will tell the factfinder only that it is possible individual class members were compensated for less time than they actually worked. Given the fact that individual employees arrived late and left early on various days, the factfinder would still have to determine the arrival and departure time of each employee on each day, compare that

to the time the employee recorded in VCC, and determine whether that time (rounded to the nearest 15-minute interval) resulted in under-compensation of the employee.

■ Prior cases on the proper classification of employees as exempt or non-exempt illustrate the divide between common policies that predominate and those that do not. In *Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474 (E.D.Cal.2006), defendant argued that class members were exempt from the overtime requirements of California law because the gross weight of their trucks exceeded 26,0001 pounds. *Id.* at 486. The court concluded that this common defense was central to the case, since it would dispose of plaintiffs' claims if successful and would not be an issue in subsequent individual trials if it failed. *Id.* at 490. It observed: "Even if the relevant facts—the weight of the Route Sales Drivers' trucks—are ultimately subject to dispute, it appears they can be resolved with reference to simple forms of proof." *Id.* In contrast, in cases in which the critical question has been how much time each putative class member spends on nonexempt activities, courts have concluded that the predominance requirement is not met, since liability turns on a fact-specific analysis of each employee's time. See *Jimenez,* 238 F.R.D. at 252; see also *Gales,* 2011 WL 3794887 at *10 ("Determining 'how the employee actually spends his or her time' would therefore require many individualized inquiries. Accordingly, common questions do not predominate over individualized ones in this case"); *Weigele v. FedEx Ground Package Sys., Inc.,* 267 F.R.D. 614, 622 (S.D.Cal.2010) (denying class certification where "the amount of time any particular manager spent in any particular area varies greatly"); *Trinh v. JP Morgan Chase & Co.,* No. 07–CV–1666 W(WMC), 2008 WL 1860161, *4 (S.D.Cal. April 22, 2008). Similarly, the court cannot determine that Aerotek has violated a plaintiff's right to minimum wages and overtime without determining on an individual basis how much time the employee worked compared to the time for which he or she was compensated.[60]

---

60. At the hearing, Pryor argued that common questions predominate because the policies about which she complains, in the aggregate, were more likely to result in under-compensation of

employees than overcompensation. Even assuming this is true, concluding that Aerotek's policies probably caused some workers to be underpaid would not resolve the court's concerns, as it

The fact that Aerotek's liability turns on comparison of individual employees' recorded hours and hours actually worked might not compel the conclusion that individual issues predominate if Pryor could convincingly show that Aerotek's policies had a uniform impact on employees that was subject to common proof. As Aerotek notes, however, there are significant discrepancies in employees' testimony regarding how early they were told to arrive on their first day of work and how early they were told to arrive at work in general.[61] In an attempt to show that common proof of under-compensation is possible, Pryor's attorney Devin Coyle has proffered a declaration analyzing 821 computer log-ins by employees who logged in before 5:00 a.m. (purportedly the time the first shift began). Coyle contends his analysis shows that would-be class members, on average, logged in 6 minutes and 47 seconds before their start time.[62] As defendants note, however, Coyle's calculation is fraught with problems.[63] The collected data includes only occasions on which employees allegedly arrived early when in fact the totality of the data suggests employees frequently arrived late.[64] Coyle's data set includes data points for Stacey Leslie and concludes she performed pre-shift work by assuming that her start time could not have been earlier than 5:00 a.m. Leslie's testified, however, that her start time was actually 4:30 a.m.[65] Three hundred of the 821 records Coyle reviewed concern a single employee, Alicia Aguilar–Serna.[66] Moreover, as Aerotek notes, start time is at best an imperfect device for determining whether an employee was correctly compensated, since employees were paid based on their reported time, not based on when their

---

**61.** Opposition at 12–13, 20.

would still be required to determine, on an individualized basis, *which* employees were underpaid and by how much. As explained *infra*, Pryor has given the court no confidence that these latter questions can be resolved on a classwide basis, such that it is appropriate to find that common questions predominate over individualized ones.

**62.** Coyle Declaration at 3. Aerotek argues that Coyle's declaration and analysis should be excluded as impermissible expert testimony. (Opposition, Exh. 11 ("Request to Exclude Coyle Declaration").) While the court does not afford the evidence significant weight, it disagrees that a simple average can only be presented through expert testimony. *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1124 (10th Cir.2005) ("Taking a simple average of 103 numbers, though technically a statistical determination, is not so complex a task that litigants need to hire experts in order to deem the evidence trustworthy. A mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed.R.Evid. 701"); see also *Pacific Enterprises v. Federal Ins. Co.*, 189 Fed. Appx. 591, 592 (9th Cir.2006) (Unpub. Disp.) (holding that a lay witness accountant could testify to the amount of the loss, based on her observations and summary of the accounting data). The court notes that the parties have filed a host of evidentiary objections to evidence submitted in support of or opposition to the certification motion. "[T]the Court rules only on those objections that relate to evidence [on which] it relies ... in support of its decision." *Wren*, 256 F.R.D. at 180.

**63.** Pryor objects to the report of Bruce L. Ross, who notes the deficiencies in Coyle's analysis, arguing that Ross is not an expert in statistics or survey research. They argue his testimony should be excluded under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). While courts in this circuit have previously concluded that expert testimony is admissible in evaluating class certification without a rigorous *Daubert* inquiry, the Supreme Court in *Dukes* "doubt[ed] that this is so." *Dukes*, 131 S.Ct. at 2554. The court need not resolve this issue. A lay witness can testify to opinions that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702." FED. R.EVID. 701. It is possible for a single witness to provide both lay and expert testimony, and the court can strike portions of a lay witness' testimony that exceed his or her personal knowledge. *Fresenius Medical Care Holdings, Inc. v. Baxter Intern., Inc.*, No. C 03–1431 SBA, 2006 WL 1330002, *3 (N.D.Cal. May 15, 2006). Here, just as Coyle can offer testimony about averages and what he believes the records show, Ross can offer rebuttal testimony based on his review of the data Aerotek compiled at Pryor's request and Coyle used to conduct his analysis. (Opposition, Exh. A ("Ross Decl."), ¶ 2.) These statements can be considered without relying on his expert opinion regarding the statistical significance of the data. This is what the court has done.

**64.** Opposition at 16; Ross Decl., ¶ 22.

**65.** Opposition at 16; Ross Decl., ¶ 21.

**66.** Opposition at 16; Ross Decl., ¶ 24.

shift began.[67]

Even if one were to accept Coyle's calculation as accurate, it establishes only that employees who began work early, on average, did so 6.78 minutes prior to the beginning of their shifts.[68] Given Pryor's concession that Aerotek permitted employees to log in to VCC five minutes before the start of their shift,[69] this would mean that employees who arrived early, and not late, commenced work an average of 1.78 minutes before they were permitted to log in to VCC. This gap is so small that it is likely many of the people arriving early in fact arrived after the time at which they were permitted to log into VCC and begin compensated time. Again, an individualized inquiry would be required to determine for which employees this was true. This is particularly problematic because some putative class members have stated that they logged into their computers upon arriving at work but then spent time eating breakfast or socializing with friends before logging onto VCC and accepting calls.[70] This testimony suggests that the computer logins time may differ significantly from the time an employee actually began work for which he or she was entitled to be compensated. See *Cornn v. United Parcel Service, Inc.*, No. C03–2001 THE, 2005 WL 2072091, *5 (N.D.Cal. Aug. 26, 2005) ("The only classwide evidence provided by Plaintiffs demonstrates only that package-car drivers enter start times on their DIADs that sometimes differ from the drivers' scheduled start times, and that UPS only begins to count hours worked from drivers' scheduled start times, or from the punched-in time if the punched-in time is later than the scheduled start time. This practice would only be unlawful if drivers were actually working during the time between when they punched in and when they were scheduled to start work. However, there is no common practice among package-car drivers as to when they punch in to work. Some drivers may punch in immediately after arriving at the building, while others may punch in just before their scheduled start times. In addition, drivers perform a variety of non-work-related tasks, such as socializing, reading the newspaper, and drinking coffee or tea, after punching in but before their scheduled start times").

The need for individualized determinations is also evident from the fact that many employees testified, as Pryor herself initially did, that they rounded their total work time to the nearest 15–minute interval, not their start and end times.[71] If true, that would mean that even an employee who worked for a few minutes before recording time in VCC may have been compensated for the time if the employee rounded his or her total time up at the end of the day. In short, none of the information Pryor has provided gives the court reason to believe it could reach any conclusion as to whether, on a classwide basis, employees were underpaid. See *id.* (declining to certify a class in a suit involving allegations of uncompensated pre-shift work "[b]ecause the Court cannot determine whether a driver performed work during the interval in question without undertaking individualized inquiries that predominate over any common questions").

---

67. Opposition at 16; Ross Decl., ¶ 25.

68. Motion at 9.

69. *Id.* at 11.

70. Opposition, Exh. 10 (Defendant Aerotek Scientific, LLC's Compendium of Declarations in Support of Its Opposition to Plaintiff's Motion for Class Certification) ("Defendant's Compendium of Declarations"), Exh. 4 (Declaration of Patricia Garcia), ¶ 8 ("I will typically log into Windows approximately 15 minutes before my shift began because I wanted some down time before I hard to start work.... I do not perform any work before I log onto the VCC system"); Exh. 9 (Declaration of David Person), ¶ 8 ("I typically socialize in the break room, eat my breakfast or sent text messages before I log onto VCC").

71. See Defendant's Compendium of Declarations, Exh. 1 (Declaration of Diana Aparicio), ¶ 15 ("No one ever instructed me to round my start time or end time to the nearest quarter hour. Instead, I was instructed to round my total time to the nearest quarter hour"); Exh. 2 (Declaration of Debbie Donley), ¶ 15 (same); Exh. 3 (Declaration of Belen Garcia), ¶ 15 (same); Declaration of Patricia Garcia, ¶ 16 (same); Exh. 5 (Declaration of Anthony Green), ¶ 16 (same); Exh. 6 (Declaration of Kiyana Long), ¶ 15 (same); Exh. 7 (Declaration of Kimberly Myers), ¶ 16 (same); Exh. 8 (Declaration of Ryan Nguyen), ¶ 15 (same); Declaration of David Person, ¶ 16 (same); Exh. 10 (Declaration of Karla Vega), ¶ 14 (same).

Pryor argues that any deficiencies in her data are irrelevant, because Coyle's report is only intended "to illustrate that [Aerotek's] records pertaining to employee's time entries and log records, when collectively analyzed, can transform into common evidence relevant to establishing routine and regular performance of pre-shift work without compensation."[72] The court disagrees. Instead, it believes Coyle's analysis shows there is no reliable way to determine if an employee was paid for fewer hours than actually worked without examining each employee's individual time records and considering the employee's individual testimony. There appears to be significant variation in how early employees arrived, how early they logged onto their computers, how long it took them to log into other programs before logging into VCC, whether they performed non-work activities after their computer logons, and how they rounded their time. Given that Pryor only alleges that would-be class members were uncompensated for a few minutes of work a day, the types of variation the court has identified will control whether an individual employee was under-compensated, over-compensated, or compensated correctly. Pryor's assertion at the hearing that statistical analysis or sampling could be used to establish Aerotek's liability is unconvincing. Assuming *arguendo* that the court permitted statistical proof that employees, on average, were under-compensated for their work at Aerotek, the statistics would not aid the court in separating the employees who were under-compensated from those who were not. *In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 268 F.R.D. 604, 612 (N.D.Cal. 2010) ("plaintiff argues that individualized inquiries could be averted by using random sampling of class members to determine whether the class, as a whole, qualified for any of the asserted exemptions. Through this random sampling, plaintiff asserts, the court could arrive at some 'average' for purposes of liability. 'An example would be: The Court finds that out of thirty testifying HMCs, twenty-seven were non exempt and, of those, an average of eight hours of overtime per week were worked.' ... Plaintiff

then claims, without providing sufficient detail, that '[t]here are several ways to extrapolate that finding to all other members or all members who submit proofs of claim.' ... In so arguing, plaintiff has inadvertently undermined their own arguments for the predominance of common issues. Assume that the court permitted proof through random sampling of class members, and that the data, in fact, indicated that one out of every ten HMCs is exempt. How would the finder of fact accurately separate the one exempt HMC from the nine nonexempt HMCs without resorting to individual mini-trials? Plaintiff has not identified a single case in which a court certified an overbroad class that included both injured and uninjured parties"). Pryor has given the court no reason to believe that if a class were certified, hundreds of mini-trials on the issues necessary to determine if Aerotek underpaid employees would not be required. The court therefore determines that individual questions predominate over common ones.

Pryor's failure to establish predominance extends to her claims that putative class members' wage statements were inaccurate, and that class members were denied post-termination compensation to which they were entitled. These claims are wholly derivative of Pryor's pre-shift work claims. Pryor asserts that her wage statements were inaccurate because they failed to include the overtime and minimum wages for pre-shift work to which she was purportedly entitled.[73] The wages she alleges she was denied post-termination are once again overtime and minimum wages for pre-shift work.[74] The claims thus rely on resolution of the same individual issues that the court has concluded predominate over issues subject to common proof.

### 2. Superiority

"Under Rule 23(b)(3), the court must evaluate whether a class action is superior by examining four factors: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy

**72.** Reply at 4.

**73.** Second Amended Complaint, ¶ 53.

**74.** *Id.,* ¶ 60.

already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Edwards v. City of Long Beach,* 467 F.Supp.2d 986, 992 (C.D.Cal.2006) (quoting *Leuthold v. Destination Am., Inc.,* 224 F.R.D. 462, 469 (N.D.Cal.2004)).

██ On balance, these factors weigh against certification. Pryor argues that it would be impractical, prohibitively expensive, and inefficient for hundreds of employees to file individual claims.[75] For the reasons stated above, however, adjudicating this case as a class action will not achieve markedly greater efficiency. The overwhelming bulk of the issues in the case cannot be resolved on a classwide basis, and will instead require individual comparison of the time each employee reported and actually worked. *Jimenez,* 238 F.R.D. at 253 ("[B]ecause the issues presented are to be determined based on an individual's experience, testimony will vary from employee to employee.... [S]urveys and statistics may establish whether uniform classification was improper but will not be helpful in determining whether each general manager himself was wrongly classified or not"); see also *Velazquez v. Costco Wholesale Corp.,* No. SACV 11–00508, 2011 WL 4891027, *7–8 (C.D.Cal. Oct. 11, 2011) ("Because the Court finds that individual issues predominate over common issues, it is not necessary to address whether a class action is the superior vehicle for adjudicating Plaintiffs' claims. It is worth noting, however, that the difficulties in managing a class action such as this would be great because countless individual witnesses would be needed, resulting in mini-individual trials within a class trial"); *Maddock v. KB Homes, Inc.,* 248 F.R.D. 229, 248 (C.D.Cal.2007) ("Because the Court concludes that individual issues predominate in the instant case, it is clear that a class action would not be superior to other methods of adjudication. For these reasons, plaintiff's motion for class certification must be DENIED.").

Pryor offers no suggestions as to how the individual issues that predominate in this case could be adjudicated so as to achieve the efficiency and economy that is the goal of certifying a class. Pryor, of course, is not required to submit a trial plan for litigation of a class action. *Sullivan v. Kelly Services, Inc.,* 268 F.R.D. 356, 365 (N.D.Cal.2010) ("Nothing in Rule 23 requires Plaintiff to submit a formal trial plan along with her motion for class certification," citing *Chamberlan v. Ford Motor Co.,* 402 F.3d 952, 961 n. 4 (9th Cir.2005)). In the absence of one, however, the court cannot envision how it would conduct hundreds of individual inquiries to determine whether an employee's recorded time was less than the actual hours that employee worked. Although it recognizes that the cost of litigating such claims on an individual basis might well dwarf the potential recovery, the court does not believe that certifying a class is superior since the individual issues to be adjudicated will dominate, result in an unmanageable series of mini-trials, and consume an extraordinary amount of time.

### III. CONCLUSION

For the reasons stated, the court denies plaintiff's motion to certify a class comprised of all employees of Aerotek Scientific, LLC who were assigned to a UnitedHealth Group Prescription Solutions call center in California at any time from August 2, 2006 to the present. Plaintiffs may file a renewed motion for class certification that addresses the deficiencies noted in this order within twenty (20) days of the date of the order.

---

**75.** Motion at 24.